UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1-16-CR-124-CLC-CHS |
| v. ) | |
| ) | |
| JAMES SILAS ) | |

## REPORT AND RECOMMENDATION

### I.     Introduction

Defendant James Silas is charged with, among other things, conspiring to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.  He moves to suppress the seizure of a Samsung Galaxy Note cellphone [Doc. 147].  In addition, he moves to suppress evidence of a photographic identification of Defendant [Doc. 151].   For the following reasons, it is RECOMMENDED that the motions to suppress be DENIED.

### II.     Facts

An evidentiary hearing was held before the undersigned Magistrate Judge on these motions on July 10, 2017.  I will address each motion separately.

#### A.     Motion to Suppress Seizure of the Samsung Galaxy Note Cellphone[1]

The government presented four law enforcement officers to testify in response to the motions to suppress:  Special Agent Michael McClarence with the Drug Enforcement Agency (DEA) in Chicago; Deputy Christopher Oslanzi, a deputy sheriff and DEA task force officer in Will City, Illinois; Officer Pat Curran, a police officer and DEA task force officer in Oaklawn,

---

[1] In his written motion, Defendant also sought to suppress seizure of a white iPhone.  At the evidentiary hearing, the government represented to the Court that it had not been able to access the data inside the white iPhone, that it did not intend to carry out any more efforts to do so, and, therefore, the white iPhone at issue would not be used in any manner at trial against Defendant.  Consequently, the undersigned finds the motion to suppress as to the white iPhone is moot.

1

Illinois; and Special Agent William Wise, a DEA agent in Chattanooga, Tennessee. The officers testified as follows:

- DEA agents in Chattanooga, Tennessee, were investigating heroin trafficking in the Chattanooga area and learned that some of the suppliers resided in the Chicago area. Defendant James Silas was identified as one of those suppliers. Agent McClarence and Officer Curran of the Chicago DEA office assisted in this investigation. As part of their investigation, they surveilled Defendant six to twelve times. "Several times," they observed him driving a white Cadillac Escalade registered to Defendant's mother. According to Agent McClarence, the Escalade was "the main vehicle" driven by Defendant. Agents also observed Defendant driving a black BMW registered to him.

- On October 4, 2016, Agent McClarence obtained a search warrant from the United States District Court for the Northern District of Illinois. The warrant authorized law enforcement to search Defendant Silas's residence in Dolton, Illinois, for evidence of a heroin distribution conspiracy.

- Agent McClarence intended to execute the search warrant on October 12, 2016. He drove by Defendant's residence the day before the planned search to conduct a "spot check." Agent McClarence knew that Defendant had a history of gang affiliation and had been convicted of a homicide. Consequently, he planned to have a SWAT Team assist with execution of the warrant the following day. In addition, DEA agents from Chattanooga were flying to Chicago to participate in the search warrant execution.

- When Agent McClarence conducted the spot check, he observed a white Cadillac Escalade parked in the driveway with its tailgate facing Defendant's house. A mattress was tied to the top of the Escalade, with furniture and luggage inside the vehicle. An automobile was parked nose to nose with the Escalade. The hoods of both vehicles were up. A young man was sitting in the passenger seat of the Escalade. Agent McClarence concluded that Defendant was about to jump-start the Escalade.

- Agent McClarence believed that Defendant was preparing to vacate the residence. As a result, he decided the situation was "exigent" and that execution of the search warrant needed to be accelerated. The Chattanooga DEA agents were still en route to Chicago by plane. Agent McClarence contacted other officers to come to the scene to execute the search warrant immediately. Several other law enforcement officers, including Officer Curran, arrived shortly thereafter. As they continued their surveillance, they observed Defendant and his wife retrieving items from the house and loading them into the Escalade.

- Officer Curran watched as Defendant sat in the driver's seat and attempted, unsuccessfully, to start the Escalade. While Agent McClarence drove around the corner, Officer Curran observed Defendant exit the Escalade and approach the engine. Officer Curran believed that Defendant was about to jump-start the Escalade and drive away.

2

- Officer Curran testified that, by observing Defendant, he concluded Defendant was not armed. Officer Curran, accompanied by Officer Tom McDonald, approached Defendant while he was focusing on the engine to secure the jumper cables. As they approached, Officer Curran stated, in a calm voice, "James Silas. Police. We have a search warrant for your residence." Other officers followed immediately behind Officer Curran. Law enforcement did not have their guns drawn, although Officer Curran indicated that he may have had his hand on the butt of his firearm. Voices were not raised. Officer Curran conducted a pat-down search, finding only a cellphone on Defendant (which cellphone is not a subject of the motion to suppress). Defendant was not placed in handcuffs. He was very cooperative, telling his wife and stepson that things would be alright, and to let the police do their jobs.

- Agent McClarence approached Defendant with the search warrant, and explained why he was there. Defendant gave Agent McClarence the house keys. McClarence, Defendant and another officer entered the house and sat at the kitchen table. Some of the officers stayed outside with Defendant's stepson and Defendant's wife, Jacqueline Silas.

- Other officers including Officer Curran entered the house to conduct a protective sweep and begin the search. Agent McClarence remained at the kitchen table with Defendant and two other officers. Defendant asked if he was under arrest. Agent McClarence responded that he was not. Defendant was not handcuffed and no weapons were drawn. The conversation was calm and polite. No voices were raised. Agent McClarence gave Defendant his *Miranda* rights orally and in writing. Defendant signed a *Miranda* rights waiver form, and Agent McClarence asked Defendant for basic biographical information.

- About fifteen minutes after police entered the residence, other officers found some cellphones in a bedroom. Agent McClarence asked Defendant if there were any other phones. Defendant answered, "yes, in the Escalade." Agent McClarence asked if he could retrieve the cellphone from the Escalade. Defendant replied that he could. Officer Christopher Oslanski then retrieved a black Samsung Galaxy Note cellphone from the Escalade. The Escalade was unlocked and the cellphone was located in the center console. At the request of Agent McClarence, Defendant gave agents the passcode to open the phone.[2] At some point during this conversation, Agent McClarence told Defendant he was in serious trouble and he could help himself by identifying his supplier. After about 30 or 40 minutes, the Tennessee DEA agents arrived and assumed control of the interview. Chattanooga DEA agent Bill Wise questioned Defendant for about an hour, asking more specific questions about the alleged heroin conspiracy.

- Jacqueline Silas, Defendant's wife, had a different view of the events on October 11, 2016. Ms. Silas testified that, on the day the warrant was served, they were helping her son move into an apartment. They were loading her son's belongings into Ms. Silas's

---

[2] A search warrant for the contents of the cellphone was subsequently obtained. [*See* Doc. 158-3, Search and Seizure Warrant for Black Samsung Galaxy Note]. Defendant does not challenge the facial validity of the subsequent warrant to search the contents of the Galaxy Note. Defendant's challenge to the admissibility of the information found in the Samsung Galaxy Note is that the cellphone's initial seizure violated the Fourth Amendment and, therefore, seizure of its contents is fruit of the poisonous tree.

3

Case 1:16-cr-00124-CLC-CHS   Document 246   Filed 08/24/17   Page 3 of 12
PageID #: 2949

Nissan Maxima and into the white Cadillac Escalade, which belonged to Defendant's mother. The Escalade would not start. Consequently, Ms. Silas positioned the Maxima nose to nose with the Escalade to jump-start it. Suddenly seven or eight cars pulled up "really fast" blocking the driveway. Ms. Silas testified that police officers, with guns drawn, jumped out of their cars shouting, "James Silas, put your hands up in the air." Ms. Silas was in the Maxima with her nephew, and they were "scared to death." In response to Ms. Silas' inquiries, police showed her the search warrant and told her they were looking for guns. She told them they did not have any guns. She stated that she waited with the rest of her family for four to five hours while they kept Defendant inside. At her request, law enforcement retrieved a chair from the house so that she could sit. She stated that she saw an agent retrieve an iPhone, a Samsung Galaxy Note and an iPod from the Escalade. Her Maxima was searched without her permission.

I credit the version of events given by the law enforcement officers. The testimony that they gave separately in open court, outside of each other's presence, was consistent from one officer to the next. I also found it significant that Ms. Silas testified that the law enforcement officers told her they were searching for guns when, in fact, the search warrant was for documentary evidence of a heroin conspiracy. It would not have benefited the police officers to have misrepresented the purpose of the search, and I deem it highly unlikely that they would have made such a misrepresentation.

Ms. Silas stood alone in relating a different version of events concerning the execution of the search warrant. Ms. Silas had an understandable motive to misrepresent the events of October 11, 2016, at the evidentiary hearing. Her husband is charged with a serious crime, and the version of events that she offered would make it more likely that some evidence might be suppressed. I do not find her recollection of events to be accurate or credible.

### B.    Motion to Suppress Evidence of Photographic Identification

Agent Bill Wise was the only witness to testify with respect to the Motion to Suppress Evidence of Photographic Identification. On August 24, 2016, as part of an intensive investigation into a suspected heroin distribution conspiracy in the Chattanooga area, DEA agents executed a search warrant at Heather Robinson's residence. Ms. Robinson is one of

4

Defendant James Silas's alleged co-conspirators. After the warrant was executed, Robinson came to the DEA office in Chattanooga where Agent Wise interviewed her regarding her heroin suppliers. Robinson identified one of her suppliers as "the P" or "the Prince," indicating that he resided in the Chicago area. Robinson did not provide a physical description of "the P" or "the Prince" during this interview. Through the use of wiretaps, the DEA had previously intercepted conversations between Robinson and the supplier referred to in the conversations as "the P" and "the Prince" located in the Chicago area. During the interview, Robinson told Agent Wise that, in the spring of 2015, she had met "the Prince" at his residence when she traveled to Dalton, Illinois with her husband, Jovani Robinson, Marlon Eberhardt, and Breanna Parton to purchase heroin from "the Prince." Jovani Robinson and Mr. Eberhardt left the residence with Defendant while Ms. Robinson and Breanna Parton remained in the car outside the residence. At some point, Ms. Robinson was permitted inside the house to use the bathroom. When Jovani Robinson, Eberhardt, and Defendant returned, they had two packages wrapped in black tape which she believed to be heroin. Robinson also stated that she had participated in a number of telephone calls with "the Prince." After interviewing Robinson for several hours, Agent Wise showed her approximately 75 photographs of people who had been identified during the course of the investigation as persons of interest.

Before showing Robinson any photographs, Agent Wise told Robinson he was going to show her some photographs and she "may or may not know the people in them." Each photograph was shown to Robinson one at a time. Some of the photos were in black and white and some were in color. Some photos came from social media while others were derived from driver's licenses. Defendant's photograph was a booking photograph. All the photographs were arranged in alphabetical order and were pulled from files that the DEA had made for each

individual identified as a person of interest during the investigation. Any identifying information on the photographs was covered up so that Ms. Robinson could see only the photographs. Initially, Agent Wise would show Ms. Robinson a photograph and ask her if she knew the person, but after doing this a few times, he simply showed her the photograph and she said whether she knew that person. Agent Wise showed Ms. Robinson about 50 photographs before he showed her Defendant's photograph. When he did so, she said, without any suggestion or prompting from him, "that's the P." She did not hesitate or equivocate when identifying Defendant. In all, Robinson identified 20 to 25 people from the photographs she was shown. Robinson also identified a photograph of Defendant's residence.

### III. Discussion

#### A. Motion to Suppress Seizure of the Samsung Galaxy Note Cellphone

Defendant initially argued that search of the Escalade parked outside Defendant's residence fell outside the scope of the search warrant issued for Defendant's residence. The government responded that it was relying on two exceptions to the Fourth Amendment's search warrant requirement: (1) consent; and (2) the automobile exception. I conclude that Defendant gave valid consent to law enforcement to permit them to search the Escalade and seize the Samsung Galaxy Note cellphone. Consequently, it is unnecessary to discuss the automobile exception argument presented by the government. Valid consent provides a sufficient exception to the warrant requirement for the seizure of the Galaxy Note cellphone.

A search conducted pursuant to a valid consent is a well-recognized exception to the general warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). A search may be conducted without a warrant if a person with a privacy interest in the place to be searched gives free and voluntary consent. *United States v. Elkins*, 300 F.3d 638,

6

647 (6th Cir. 2002). The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth*, 412 U.S. at 227; *United States v. Beauchamp,* 659 F.3d 560, 571 (6th Cir. 2011). The appropriate inquiry is whether, taking into account all the circumstances surrounding the encounter, a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter. *Florida v. Bostick*, 501 U.S. 429, 435-37 (1991). The government must establish that consent was voluntary by a preponderance of the evidence, with evidence that is clear and positive. *Beauchamp*, 659 F.3d at 571; *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009); *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998). For consent to be voluntary, it must be unequivocal, specific, intelligently given, and free from duress or coercion. *Beauchamp*, 659 F.3d at 571; *Canipe*, 569 F.3d at 602; *Erwin*, 155 F.3d at 823 (citing *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978)). Factors to consider include the age, education, and intelligence of the individual who gave consent and whether that person understands his right to refuse and his constitutional rights. *Beauchamp*, 659 F.3d at 572 (citing *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988)). Other factors to consider include the length and nature of detention and whether the police used overt or subtle forms of coercion or punishment. *Beauchamp*, 659 F.3d at 572 (citing *Schneckloth*, 412 U.S at 226). These factors do not establish bright line rules for a valid consent; rather, the touchstone of the Fourth Amendment is reasonableness, and the Supreme Court has "expressly disavowed any 'litmus-paper test' or single 'sentence or . . . paragraph . . . rule,' in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment." *Ohio v. Robinette*, 519 U.S. 33 (1996) (citing *Florida v. Royer*, 460 U.S. 491, 506 (1983)).

7

Case 1:16-cr-00124-CLC-CHS Document 246 Filed 08/24/17 Page 7 of 12
PageID #: 2953

In the instant case, Defendant argues that he was coerced into giving his consent. "A defendant 'must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police' in order to invalidate consent." *Elkins*, 300 F.3d at 648 (quoting *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995)). Defendant further argues that his consent to seize his cellphone in the Escalade was mere acquiescence to police power, and, pursuant to *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999), his consent to seize the cellphone from the Escalade was not valid. In *Worley*, the Court of Appeals for the Sixth Circuit held that the government failed to meet its burden of proof that a defendant's consent was given voluntarily where, in response to officers' request to search, the defendant stated, "you've got the badge, I guess you can." *Id*. at 386.

Defendant in the instant case is an adult with significant prior experience with law enforcement. The evidence indicates he has no mental or intellectual disabilities. Law enforcement approached him in a calm manner. The conversations between Defendant and law enforcement were calm and polite. No guns were drawn. Defendant was not threatened in any way. Defendant was told he could "help himself" by revealing his supplier, but this assurance is not, by itself, sufficient to overbear Defendant's will in deciding whether to give consent to search. *See United States v. Young*, 318 Fed. App'x 407, 409 (6th Cir. 2009) (agent's statement that defendant could "help himself" by providing information to agents did not invalidate consent to search); *United States v. Wood*, No. 1:15-cr-35, 2016 WL 6426376, at *3,*7 (E.D. Tenn. Oct. 3, 2016) (same). While he was not free to leave, law enforcement told him he was not under arrest and he would be released after the search was concluded. Following the search, he was, in fact, released. Defendant and the officers were comfortably seated at the kitchen table, and he was given his *Miranda* rights. About fifteen minutes into the search, Agent

8

McClarence asked Defendant whether there were any more cellphones. Defendant stated there was another cellphone in the Escalade and that law enforcement could retrieve it.

Based on these facts, I conclude there is no objective evidence of coercion. The government has proved by a preponderance of the evidence, with clear and positive evidence, that Defendant knowingly and voluntarily gave his consent for law enforcement to seize his Samsung Galaxy Note cellphone located in the Escalade.

Finally, Defendant has not argued that he did not have authority to give consent to law enforcement to search the Escalade; however, had he made that argument, I would find that Defendant had authority to give consent. "[P]ermission to conduct a warrantless search may be given not only by the owner of the property, but also by 'a third party who possessed common authority over or other sufficient relationship to the premises or effects to be inspected.'" *United States v. Attar*, No. 89–5659, 1990 WL 102876, at *2 (6th Cir. July 24, 1990) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). Further,

> [u]nder the Matlock test, the driver of an automobile generally has apparent authority to consent to a search of the vehicle. *United States v. Morales*, 861 F.2d 396, 399-400 (3d Cir.1988); *United States v. Varona-Algos*, 819 F.2d 81, 83 (5th Cir.), *cert. denied*, 484 U.S. 929 (1987). The driver has immediate possession and control over the vehicle and ordinarily has access to all internal and external compartments. Under those circumstances, it is reasonable to assume that he has authority to consent to a search.

*Attar*, 1990 WL 102876, at *2.

Agent McClarence testified that he had previously observed Defendant use the Escalade as his "main vehicle," and that on October 11, 2016, Defendant sat in the driver's seat and attempted to start the vehicle. There was no testimony that his mother, to whom the car was registered, was at the scene. On October 11, 2016, Defendant was the person exercising control

9

Case 1:16-cr-00124-CLC-CHS Document 246 Filed 08/24/17 Page 9 of 12
PageID #: 2955

over the Escalade, which leads to the conclusion that he had authority to give consent to search the vehicle.

### B. Motion to Suppress Evidence of Photographic Identification

In this Motion to Suppress, Defendant asserts Heather Robinson's identification of his picture violated his Due Process rights for two reasons: (1) the method used to identify his photograph was suggestive; and (2) the witness's basis for identifying him was insufficient and unreliable thereby leading to a substantial likelihood of irreparable misidentification.

"Due process forbids police officers from using identification procedures that are 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Watson*, 540 Fed. App'x 512, 514-15 (6th Cir. 2013) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see also Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005). Review of a motion to suppress identification evidence is a two-step process:

> Suppression is warranted only if (1) the identification procedure was unduly suggestive, and (2) the identification was not otherwise reliable under the totality of the circumstances. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070–71(6th Cir. 1994). We look first to the defendant to prove that the identification process used was in fact unduly suggestive. *United States v. Beverly*, 369 F.3d 516, 538 (6th Cir. 2004). Mere suggestiveness does not give rise to a constitutional violation. *Howard v. Bouchard*, 405 F.3d 459, 470 (6th Cir. 2005). Rather, the evil to be avoided is unnecessary suggestiveness that creates a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). If the defendant fails to show that the identification procedure was tainted by undue suggestiveness, our analysis ends. *See ibid.*

*Watson*, 540 Fed. App'x at 515*; see also Howard*, 405 F.3d at 469-72 (discussing two-step process for evaluation identification procedure); *United States v. Moore*, No. 14-20219, 2015 WL 5502747, at *7 (W.D. Tenn. Aug. 5, 2015) (same). "Unnecessary suggestiveness generally depends upon whether the witness's attention was directed to a suspect because of police

10

Case 1:16-cr-00124-CLC-CHS   Document 246   Filed 08/24/17   Page 10 of 12
PageID #: 2956

conduct." *Howard*, 404 F.3d at 469-70 (internal citation omitted). The effect of police conduct, not an officer's subjective intent, should be the focus of this inquiry. *Id.* at 470.

If the defendant meets his burden to show that the identification procedure was unduly suggestive, the court must then consider the second step of the evaluation process: whether the identification process was nonetheless reliable under the totality of the circumstances. *Howard*, 405 F.3d at 469; *Watson*, 540 Fed. App'x at 515; *Jones v. Warden, Ross Correctional Inst.*, No. 1:09-cr-158, 2011 WL 1113239, at *11 (S.D. Ohio Mar. 21, 2011). The court should consider the following factors when evaluating the reliability of an identification procedure:

> (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification.

*Howard*, 405 F.3d at 472 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

In the instant case, the Court need not proceed beyond the first step of the two-step evaluation. Defendant asserts in his motion that Agent Wise showed Defendant's picture to Heather Robinson and asked, "is this "P" or "the Prince?" thereby suggesting to Ms. Robinson that Defendant was the drug supplier in the Chicago area known as the P or the Prince. The evidence at the suppression hearing disproved this contention. Agent Wise made no suggestions to Ms. Robinson as to the identity of any of the approximately 70 photographs he displayed to her. He simply showed her each photograph and asked if she could identify the individual in the picture. Further, there were no identification markings visible on the photographs themselves, and Robinson had looked at about 50 photographs before Agent Wise showed her Defendant's photograph. He told Ms. Robinson that she "may or may not know the people in them." I

11

conclude there was nothing suggestive about the manner in which Agent Wise showed Ms. Robinson the photographs, including specifically, Defendant's photograph. Having reached this conclusion, this analysis ends. *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012) ("the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.")

### IV. Conclusion

Having considered the evidence presented at an evidentiary hearing, the parties' briefs, and argument of counsel, it is RECOMMENDED that Defendant's motion to suppress the seizure of a Samsung Galaxy Note cellphone, [Doc. 147], and Defendant's Motion to suppress evidence of photographic identification of Defendant [Doc. 151] be DENIED.[3]

**ENTER.**

/s/ *Christopher H. Steger*
United States Magistrate Judge

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified constitutes a waiver of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).