UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1-16-CR-124-CLC-CHS |
| v. ) | |
| ) | |
| JAMES SILAS ) | |

### REPORT AND RECOMMENDATION

**I.     Introduction**

Defendant James Silas is charged with, among other things, conspiring to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. He moves to suppress evidence obtained from a wiretap of co-defendant Heather Robinson's telephone on the basis that the government failed to show the necessity of the wiretap prior to its issuance [Doc. 145]. For the reasons stated herein, it is RECOMMENDED that the motion to suppress be DENIED.

**II.    Facts**

The indictment against Defendant charges that, between January 2015 and September 2016, Mr. Silas conspired with Marlon Eberhardt, Jovani Robinson, Heather Robinson, and other individuals as part of an ongoing drug trafficking conspiracy carried out by "the Eberhardt Organization," in the Eastern District of Tennessee and "elsewhere" [Indictment, Doc. 1]. On June 14, 2016, Michael Thompson, a detective with the Hamilton County Sheriff's Office and a Task Force Officer with the Drug Enforcement Administration (DEA), prepared an application, including an 87 page affidavit (Detective Thompson's affidavit or "the Affidavit"), for an Order authorizing the interception of wire and electronic communications [Application and Affidavit, Doc. 146-1 and 146-2, respectively]. United States District Judge Travis McDonough's order

authorizing the wiretap was entered the same day [Order, Doc. 146-3]. Defendant asserts Detective Thompson's affidavit failed to establish the necessity of the wiretap at issue. Defendant does not assert the Affidavit failed to establish probable cause to issue the wiretap order. Therefore, my review of the probable cause section of Detective Thompson's affidavit will be brief, giving an overview of the alleged conspiracy as set out in the Affidavit. I will focus, instead, on the section of the Affidavit which addresses the necessity of the wiretap.

Detective Thompson's application sought authorization to intercept wire and electronic communications to and from cellphone number 423-400-4184, referenced as Target Telephone #2. The particular phone to which that number was assigned belonged to Heather Robinson, a co-defendant in the alleged conspiracy [Application, Doc. 146-1].

One of the primary sources of Detective Thompson's information was an individual identified as Cooperating Source Number 1 (CS-1). CS-1 provided the following information to law enforcement:

- Marlon Eberhardt (a co-defendant in this case) was a large scale distributor of heroin and marijuana in East Tennessee. Heather Robinson introduced CS-1 to Eberhardt and Jovani Robinson [*Id.* ¶ 17, Doc. 146-2].

- Eberhardt had sources of heroin supply in Chicago, Illinois; Nashville, Tennessee; and Atlanta, Georgia. Heather and Jovani Robinson were distributors for Eberhardt, and accompanied Eberhardt on trips to different cities to obtain heroin. Four females (CS-1 provided identities) had previously accompanied Eberhardt on these trips to obtain heroin for personal use or in exchange for cash [*Id.* ¶ 18].

- In approximately March or April 2016, CS-1 accompanied Marlon Eberhardt, Jovani Robinson, and Heather Robinson to Chicago, Illinois, for the purpose of purchasing heroin. On that occasion, Eberhardt obtained approximately one kilogram of heroin from "an unknown source of supply" for approximately $30,000.00 [*Id.* ¶18].

- Heather and Jovani Robinson worked as heroin distributors for Eberhardt and stored "large quantities of heroin and large sums of currency" at their various residences for Eberhardt. Eberhardt used the Robinson residence to weigh and repackage heroin. Heather Robinson distributed approximately $2,000 worth of

2

heroin a day [ *Id.* ¶20-22].

- CS-1 traveled to Atlanta, Georgia with Brandon Moore, another participant in the alleged conspiracy, at the request of Heather Robinson, to obtain heroin in April 2016 [*Id.* ¶ 24].

- CS-1 provided the phone numbers for several individuals involved in the Eberhardt organization, including two phone numbers for Marlon Eberhardt, two phone numbers for Jovani Robinson, three phone numbers for Heather Robinson, and phone numbers for four other individuals [*Id.* ¶ 25).

A second source of information for Detective Thompson was an individual identified as Cooperating Source Number 2 (CS-2). CS-2 provided the following information to law enforcement:

- CS-2 rented vehicles for members of the Eberhardt organization to utilize as part of the ongoing drug trafficking conspiracy. CS-2 rented an estimated fifteen vehicles at various points in time for Heather and Jovani Robinson starting in September 2015. Some of these vehicles were used by Eberhardt. CS-2 witnessed kilogram quantities of heroin at the Robinsons' residence as recently as January 2016. CS-2 engaged in consensual monitored and recorded text messages and telephone conversations concerning narcotics trafficking with Heather Robinson just a couple of weeks prior to the filing of the Application to Intercept Wire Communications [*Id.* ¶ 31].

- CS-2 completed a controlled purchase of .4 grams of heroin from Heather Robinson on November 3, 2015, and .4 grams of heroin from Heather Robinson on November 18, 2015 [*Id.* ¶ 44-49].

- CS-2 completed a purchase of .6 grams of heroin from Heather Robinson on March 1, 2016, in cooperation with detectives from the Hamilton County Sheriff's Office [*Id.* ¶ 59-61].

A third source of Detective Thompson's information was an individual identified as Cooperating Source Number 3 (CS-3). CS-3 provided the following information to law enforcement:

- CS-3 was a regular customer of Heather and Jovani Robinson beginning in August 2015. CS-3 identified Heather and Jovani Robinson's source of supply as Marlon Eberhardt and subsequently began to purchase heroin directly from Mr. Eberhardt [*Id.* ¶ 36-37].

- CS-3 provided significant details about the actual quantities of heroin purchased both from the Robinsons and Eberhardt. CS-3 also completed a controlled purchase of 10 grams of heroin from Marlon Eberhardt on April 19, 2016, and again on April 22, 2016 [*Id.* ¶¶ 62-68].

In December 2015, and January of 2016, Detectives with the Hamilton County Sheriff's Office reviewed phone calls made from inmates at the Hamilton County Jail to Heather Robinson in which they made coded references to stash houses and drug transactions [*Id.* ¶¶ 50, 52-54]. Surveillance of Heather Robinson on January 27, 2016, revealed Ms. Robinson engaging in hand-to-hand drug transactions at her residence [*Id.* ¶ 55]. The Government also relied upon interviews with known customers of Heather Robinson, controlled phone calls, vehicle tracking devices, and a pen register which indicated that Heather Robinson was traveling to residences associated with Marlon Eberhardt and other heroin distributors. The pen register and trap and trace device was activated on a previous phone (Target Telephone #1) owned by Heather Robinson from February 2, 2016, to February 26, 2016 [*Id.* ¶ 108]. A second pen register and trap and trace device was activated on Target Telephone #2 in May of 2016 [*Id.* ¶ 109]. The pen register identified 21 different telephone numbers regularly contacted by both Target Telephone #1 and Target Telephone #2, which phones were owned by Heather Robinson for suspected use in conjunction with the ongoing drug trafficking conspiracy [*Id.* ¶ 112].

The Affidavit contains a lengthy section entitled "Need for Interception" [*Id.* ¶¶ 114-61]. Detective Thompson indicated that interception of wire and electronic communications "is the only available technique that has a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt that the target interceptees are engaged in the target offenses . . . [and] will enable the government to further the goals and objectives of this investigation" [*Id.* ¶ 114]. Detective Thompson listed six goal and objectives: (1) discover the full scope and identification of key personnel in the Eberhardt organization; (2) discovery the identities and role

4

of all drug suppliers to the identified conspirators; (3) discover the identities of the main customers; (4) discover the stash locations for the drugs; (5) discover the management and disposition of the proceeds generated by the drug trafficking; and (6) obtain admissible evidence that demonstrates beyond a reasonable doubt that Eberhardt, Heather Robinson, and the other Targeted Interceptees committed the alleged violations of law [*Id.* ¶114].

Detective Thompson stated that while the controlled buys made from Eberhardt and Heather Robinson would subject them to prosecution for those controlled buys, the buys themselves did not reveal the "structure and elements of the organization in which EBERHARDT, ROBINSON, and others appear to be participants, as well as the source(s) of supply of heroin being trafficked by the targets of this investigation . . ." [*Id.* ¶ 116]. Detective Thompson further stated that "to successfully dismantle the organization through criminal prosecution of the offenders,"

> only the interception of communications over Target Telephone #2 will further the investigation to its above-stated goals. The organization's sources of supply appear to be in Atlanta, Georgia, which is removed geographically from Chattanooga, Tennessee, and possibly extending to other source cities. Therefore, members of this organization necessarily engage in telephone conversations and text messages with others who are their sources of supply. The requested Court authorization would enable investigators to pursue these sources of supply which, to date, have been beyond positive identification and/or prosecution.

[*Id.*].

Detective Thompson then discussed in some detail the various investigative techniques used and why they had not been and were not sufficient to enable law enforcement to meet the objectives of the investigation. Those techniques were: (1) physical surveillance; (2) confidential sources and cooperating sources; (3) interviews; (4) search warrants; (5) controlled purchases; (6) pen registers; (7) trash searches; (8) pole cameras; and (9) tracking devices [*Id.*

5

¶119-162]. Detective Thompson offered the following explanation of the shortcomings of each technique.

- Physical surveillance was conducted but was of limited use because suspects used counter-surveillance measures requiring law enforcement to discontinue the surveillance for fear of alerting the suspects to the fact that they were being investigated. It also did not provide conclusive evidence of the specific roles of the co-conspirators [*Id.* ¶¶ 119-21]. Thompson then gave specific examples of surveillance which had failed to provide the sought after information [*Id.* ¶¶ 122-25].

- Three cooperating and confidential sources were developed but were only customers of the Eberhardt Organization and could not provide information about the internal structure and activities of the organization [*Id.* ¶ 132]. Thompson then discussed specifically why each of the confidential sources referenced in Detective Thompson's affidavit could not help law enforcement meet the goals of the investigation [*Id*. ¶¶ 133-35].

- Undercover agents were not used because the Eberhardt Organization was a closed, tight knit community. Attempting to bring in an undercover agent would have aroused suspicion and been very dangerous [*Id.* ¶ 138]. While law enforcement was able to recruit confidential sources through interviews, the confidential sources took the investigation as far they could [*Id.* ¶¶ 139-40]. Thompson then discussed specific efforts to interview persons of interest which resulted in no new information being obtained [*Id.* ¶¶ 141-43].

- Two search warrants were executed in the investigation of this arrest which revealed drugs, drug paraphernalia, and a firearm, but they did not reveal information about the scope, structure and overall operations of the Eberhardt Organization [*Id.* ¶¶ 144-46].

- Five controlled purchases were made from Heather Robinson and Eberhardt, but these purchases did not and could not reveal the full scope and structure of the Eberhardt Organization including its out-of-state suppliers [*Id.* ¶¶ 149-50].

- Pen register and trap and trace information was used and helped verify frequent telephone communication between numbers, but they did not and could not identity who was making the calls or reveal the substance of the conversations [*Id*. ¶¶ 151-52].

- Trash pulls were used and did result in the discovery of a piece of mail addressed to Eberhardt at a certain address, but trash pulls produced little evidence of value and were difficult to conduct without being discovered [*Id.* ¶ 153]. For example, Heather Robinson lived in an area where obtaining trash without a neighbor observing would be difficult [*Id.*].

- Law enforcement also used pole cameras to observe traffic to and from Heather and Jovani Robinson's house. The cameras were useful in identifying some of the Target interceptees and appeared to record some hand-to-hand drug transactions, but the footage

6

Case 1:16-cr-00124-CLC-CHS   Document 247   Filed 08/28/17   Page 6 of 15
PageID #: 2964

had no sound thereby limiting its usefulness. Pole cameras also could not capture activity inside cars or the residence [*Id.* ¶¶ 156-57].

- Three tracking devices were placed on vehicles rented by CS-2 for Heather Robinson. The devices were useful in locating Heather Robinson and in assisting with surveillance, but they could not identify persons being met or the activity taking place. Further, the batteries in the devices had to be changed frequently, members of the Eberhardt Organization frequently changed vehicles, and the vehicles could not be monitored on private property [*Id.* ¶ 158].

- Mail covers were not used because there was no indication the Eberhardt Organization was using the mail to conduct its drug trafficking business [*Id.* at 159].

- A previous wiretap was issued by a United States District Judge in Maine in June 2010, and used to intercept the wire and electronic communications of Veronica Grady. Heather Robinson was intercepted pursuant to this wiretap; however, the interception was not narcotics related or criminal in nature [*Id.* ¶¶ 15, 160].

- While a financial investigation was initiated, no significant assets of the Target interceptees, who dealt primarily in cash and hid their assets under different names, was located [*Id.* ¶ 161].

- Based on advice from the Assistant United States Attorney assigned to the case and his own experience, Detective Thompson opined that grand jury subpoenas -- with or without offers of immunity -- had not been used because the principals of this conspiracy would likely lie or invoke their Fifth Amendment privileges, and, if they were given immunity to testify, then the most culpable members of the conspiracy could not be prosecuted [*Id.* ¶ 130]. Additionally, the service of grand jury subpoenas on the conspirators would alert them to this investigation which could cause them to become more cautious or flee or to threaten the informants and cooperating witnesses [*Id.*]. Detective Thompson concluded, "[c]urrently, I am not aware of any person who could be subpoenaed before the grand jury or interviewed who would provide significant and truthful evidence to prove the on-going suspected crimes in this Affidavit" [*Id.* at ¶ 131].

After Judge McDonough issued the order for the wiretap, DEA agents put in place the subject wiretap between June 14, 2016 and July 14, 2016. They intercepted at least six phone conversations between Heather Robinson or Jovani Robinson and an individual identified as "the P" or "The Prince," utilizing telephone number 630-877-8632. In addition, there were several text message exchanges between Target Telephone #2 and the same phone number. That phone

7

Case 1:16-cr-00124-CLC-CHS   Document 247   Filed 08/28/17   Page 7 of 15
PageID #: 2965

number was identified as a phone number subscribed to Jacqueline Riley. Jacqueline Riley was later determined to be the spouse of Defendant James Silas.

An Application and Affidavit for a search warrant of Mr. Silas' residence located at 223 West 146th Street in Dolton, Illinois, was later issued by the United States District Court for the Northern District of Illinois, Eastern Division, on October 4, 2016 [Application and Affidavit for a Search Warrant, Doc. 146-4]. The Affidavit in Support of the Application for a Search Warrant of Mr. Silas' residence relies heavily on the intercepted phone calls obtained from Target Telephone #2 between June 14, 2016, and July 14, 2016. Additionally, the Affidavit for the Search Warrant of Mr. Silas's residence relies heavily upon the interviews of Heather and Jovani Robinson that took place on August 24, 2016, after a search warrant was executed at their residence in North Georgia. During those interviews, both Jovani and Heather Robinson identified Defendant as a source of supply and described trips taken to the Chicago area for the purpose of obtaining wholesale quantities of heroin for distribution in Chattanooga, Tennessee [*Id.* ¶¶ 35-42].

### III. Discussion

Defendant moves to suppress all evidence obtained, directly or indirectly, as a result of the wiretap placed on Heather Robinson's phone from June 14, 2016, to July 14, 2016. "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003); *see also United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014). A defendant who seeks suppression of evidence obtained through a wiretap bears the burden of production and persuasion. *Patel*, 579 F. App'x at 453 (citing *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998)). The evidence is considered in

the light most favorable to the government. *Patel*, 579 F. App'x at 453 (citing *United States v. Rodriguez*-Suazo, 346 F.3d 673, 643 (6th Cir. 2003)). Defendant has standing to seek suppression of intercepted communications only if he was a party to those communications. *United States v. Cooper*, 868 F. 2d 1505, 1509-10 (6th Cir. 1989) (holding that when another individual's telephone is wiretapped, a defendant has standing to challenge only the interception of conversations in which he personally participated); *see also United States v. Asker*, 676 F. App'x. 447, 455 (6th Cir. 2017) (same).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522, governs the legal requirements for wiretaps. Title III "was enacted for the purpose of regularizing and controlling the issuance of warrants for wiretaps." *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). The statute requires that each application for a wiretap justify the necessity of such an intrusion. 18 U.S.C. § 2518(1)(c).[1] Pursuant to 18 U.S.C. § 2518(1)(c), to demonstrate necessity for a wiretap, the government must provide a "full and complete" statement that traditional investigative procedures: (1) have been tried and failed; or (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007).

This "necessity" requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime" and to

---

[1] 18 U.S.C. § 2518(1)(c) provides:

> **(1)** Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
>
> \* \* \*
>
> **(c)** a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

prevent wiretapping from being "routinely employed as the initial step in criminal investigation." *United States v. Landmesser*, 553 F.2d 17, 19–20 (6th Cir. 1977).[2]

Defendant argues the government failed to satisfy the necessity requirement because law enforcement did not use grand jury subpoenas, with or without immunity, and law enforcement under-utilized interviews, search warrants and consent searches in the investigation. Determination of this wiretap necessity must be made against the backdrop of the purpose of the investigation. Law enforcement had enough evidence to arrest and prosecute local dealers for heroin distribution. Their goal, however, was to determine the scope of this heroin distribution conspiracy and to prosecute the criminal co-conspirators at the top of the organizational hierarchy.

Defendant contends that Heather and Jovani Robinson were "low-level" drug dealers who could have been convinced to provide information regarding the scope and organization of the wider drug conspiracy through investigative techniques other than a wiretap. Defendant maintains that the Robinsons may have offered such information through interviews; grand jury subpoenas, with or without offers of immunity; or prosecution for the controlled buys with offers of leniency in exchange for cooperation. In support of this argument, Defendant relies upon Heather Robinson's August 2016 interview. In this interview, Ms. Robinson identified

---

[2] *See also United States v. Young*, 847 F.3d 328, 343 (6th Cir. 2017) ("what is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigation.") (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)). " [ T ] he government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163 (internal citations omitted). "[T]he mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance. We have previously recognized that 'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" *United States v. Stewart*, 306 F.3d 295, 305-06 (6th Cir. 2002) (quoting *Landmesser*, 553 F.2d at 20); s*ee also United States v. Wren*, 528 F. App'x 500, 505 (6th Cir. 2013) ("drug trafficking takes place through cell phones, requiring wiretaps to understand the scope of the organization and identify its members.") "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985) (citations omitted).

Defendant and another person as her out-of-state supplier. She also identified approximately twenty other people as being involved in the conspiracy. Defendant asserts that this interview contradicts Detective Thompson's contention that further interviews and grand jury subpoenas would not have provided the desired information. The Court notes, however, that Ms. Robinson provided this information to Detective Thompson only after law enforcement was able to confront her with facts gleaned from the wiretap. The information provided by Ms. Robinson in the August 2016 interview does not support the proposition that she or any other witness or co-conspirator would have freely offered information through traditional investigative techniques absent the wiretap.

The government has conceded that, prior to the wiretap, law enforcement had sufficient information to prosecute Heather and Jovani Robinson for the controlled buys. The government, however, disputes Defendant's characterization of Heather and Jovani Robinson as low level drug dealers. Detective Thompson's affidavit supports the government's position that they were significant dealers. One of the confidential sources reported that Heather Robinson sold heroin valued at $2,000 a day (or $730,000 in heroin sales annually). It was also reported by a confidential source that, on occasion, she stored kilogram amounts of heroin at her residence. Prior to the wiretap, the controlled buys were the only solid evidence law enforcement had to prosecute Heather and Jovani Robinson. These controlled buys, however, did not shed light on the identities of other traffickers involved in this heroin distribution network, the hierarchy of the criminal organization, or the amounts being trafficked.

With the controlled buys as the government's only leverage against the Robinsons, it was reasonable to conclude that interviews, subpoenas and prosecution were unlikely to force the Robinsons to reveal the scope of the conspiracy and to identify traffickers at the apex of the

11
Case 1:16-cr-00124-CLC-CHS   Document 247   Filed 08/28/17   Page 11 of 15
PageID #: 2969

distribution network. Moreover, an offer of immunity would have permitted the Robinsons to escape prosecution for their criminal conduct. And, indeed, efforts to compel the Robinsons to cooperate without sufficient leverage would likely alert co-conspirators of the investigation allowing them to evade prosecution.

Evidence gleaned from the wiretap gave the government greater leverage to compel the Robinsons to cooperate. I accept Detective Thompson's representation in his affidavit that additional interviews or grand jury subpoenas would not have provided the information needed in the investigation.

Defendant also asserts Detective Thompson offered only boilerplate reasons to explain why various investigative techniques were unlikely to meet the goals of the investigation. Relying on *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), Defendant argues these boilerplate reasons could apply to any drug case, lack facts specific to the instant case, and were insufficient to satisfy the necessity requirement.

In *Rice*, the Sixth Circuit affirmed a district court's decision to suppress evidence from a wiretap. *Id.* at 710-11. Law enforcement sought and obtained a wiretap for the phone of Mr. Rice, a suspected drug dealer, after intercepting, in another wiretap, a phone conversation between Rice and Shawn Bullitt. In this conversation, the two spoke of the imminent arrival of "a hundred," a reference to a large quantity of cocaine. The affidavit used to obtain the wiretap to investigate Rice set forth the reasons why other investigative techniques were dangerous or ineffective. The district court found that statements in the affidavit dealing with physical surveillance were misleading, and were made with reckless disregard for the truth. *Id.* at 710-11. Specifically, law enforcement represented that they had conducted prior surveillance of Rice when, in fact, they had not. *Id.* at 711. Further, the affidavit failed to indicate that *any*

techniques had been attempted or employed to investigate Rice. *Id.* "According to the district court, '[o]ther than some uncorroborated thoughts and opinions *there was no evidence that any other investigative technique was ever used or even seriously considered.*'" *Id.* at 709 (emphasis added.) The district court found "that the government was using the wiretap in a forbidden manner – *as the first step in its investigation against Rice.*" *Id.* (emphasis added). The statements regarding physical evidence were then excised from the affidavit leaving the following:

> (1) that the CS used in the investigation of Bullitt was not able to make contact with Rice and, therefore, would not be of use; and (2) that pen registers and telephone tolls revealed possible connections to other people with histories of drug-related arrests. Beyond that, the district court found that the [wiretap] Affidavit contained generalized and uncorroborated information about why grand jury subpoenas, witness interviewing and search warrants, and trash pulls would not be useful.

*Id.* at 711 (brackets added).

After reviewing the record, the *Rice* Court concluded the district court "was not in error in concluding that what was left of the . . . Affidavit did not provide 'a full and complete statement as to whether or not other investigative procedures had been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Id.* at 712 (quoting *Stewart*, 306 F.3d at 304.) The Sixth Circuit therefore affirmed the district court's decision to suppress the evidence obtained through the wiretap. *Id.*

The facts in the instant case distinguish it from *Rice*. In *Rice*, the wiretap was the first investigative technique employed. In the pending case, a wiretap was sought only after other investigative techniques were employed and they failed to meet the objectives of the investigation. Specifically, law enforcement conducted extensive physical surveillance [Affidavit ¶¶ 119-129]; interviewed and cultivated three confidential sources [*Id.* ¶¶ 132-37];

interviewed three other persons believed to have knowledge of the Eberhardt Organization [*Id.* ¶¶ 139-43]; executed two search warrants at the residences of persons involved in the Eberhardt Organization [*Id.* ¶¶ 144-148]; conducted five controlled drug buys from members of the Eberhardt Organization [*Id.* ¶¶ 149-50]; information from several pen registers and trap and trace warrants [*Id.* ¶¶ 151-152]; conducted trash pulls [*Id.* at 153-55]; made video recordings from pole cameras [*Id.* ¶¶ 156–157]; placed tracking devices on cars [*Id.* ¶ 158]; and initiated a financial investigation [*Id.* ¶ 161]. Detective Thompson's Affidavit explained why these techniques (and others not attempted) were unavailing. Some of the reasons for not using an investigative technique are applicable to most drug conspiracy cases. This fact does not diminish the validity of those reasons. *See United States v. Wright*, 635 F. App'x 162, 167 (6th Cir. 2015):

> Colbert attempts to minimize the level of detail SA Porrini provided, claiming that he employed "boilerplate" language applicable to any Title III investigation. But the "mere fact that the affidavit ... rested in part on statements that would be equally applicable to almost any ... case [of this kind] does not render the affidavit insufficient" so long as there is "information about particular facts ... which would indicate that *wiretaps are not being routinely employed as the initial step in criminal investigation.*"

(quoting *Landmesser,* 553 F.2d at 20) (emphasis added).

Defendant erroneously argues that Detective Thompson's affidavit must establish "the necessity for a wiretap as the *only means* for obtaining the sought after information" [Defendant's Brief in Support of Motion to Suppress at 12, Doc. 146] (emphasis added). As previously discussed, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163 (internal citations omitted). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for

14

wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985) (citations omitted). Detective Thompson's Affidavit meets this standard.

### IV. Conclusion

I conclude Detective Thompson's statement regarding the type of crime being investigated, the goals of the investigation, and his explanation as to why various investigative techniques had been or were unlikely to be successful, sufficiently met the "necessity requirement" for the issuance of a wiretap on Heather Robinson's phone. Therefore, it is **RECOMMENDED** that Defendant's motion to suppress all evidence gleaned, directly or indirectly, from the wiretap placed on Heather Robinson's phone (Target Telephone #2) between June 14, 2016, and July 14, 2016, be **DENIED**.[3]

**ENTER.**

/s/ *Christopher H. Steger*
United States Magistrate Judge

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified constitutes a waiver of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).