UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 1:16-cr-124 |
| v. ) | |
| ) | Judge Collier |
| JAMES SILAS ) | Magistrate Judge Steger |

# **M E M O R A N D U M**

Defendant James Silas filed a motion to suppress all evidence obtained as a result of a wiretap authorized by this Court (Doc. 145), a motion to suppress all evidence derived from the seizure of Defendant's cell phone (Doc. 147), and a motion to suppress a photographic identification of Defendant (Doc. 151). These motions to suppress were referred to United States Magistrate Judge Christopher H. Steger for a report and recommendation pursuant to 28 U.S.C. § 636(b). Judge Steger filed a Report and Recommendation on August 24, 2017 ("R&R 1") as to the suppression of the photographic identification and the seizure of the cell phone. (Doc. 246.) Judge Steger filed a second Report and Recommendation on August 28, 2017 ("R&R 2" and collectively, the "R&Rs") as to the intercepted wire communications. (Doc. 247.) In each, Judge Steger recommended the denial of Defendant's respective motions to suppress.[1] (Docs. 246 and 247.) Defendant objected to R&R 1 on September 7, 2017 (Doc. 249) and to R&R 2 on September 11, 2017 (Doc. 250). The Court has reviewed the record and the audio recording of the suppression hearing on these matters. For the reasons that follow, the Court will **ACCEPT**

---

[1] In his objection to R&R 1, Defendant does not address Judge Steger's recommendation as to the photographic identification. Accordingly, the Court accepts and adopts that portion of R&R 1.

**and ADOPT** the R&Rs (Docs. 246, 247) and **DENY** Defendant's motions to suppress (Doc. 145, 147, 151).

## I. BACKGROUND

### A. Interception of Wire Communications

Between January 2015 and September 2016, Hamilton County law enforcement and Drug Enforcement Administration ("DEA") agents investigated a heroin trafficking operation in the Chattanooga, Tennessee area. Spearheading this operation was a group referred to as the "Eberhardt Organization." (Doc. 146-2.) As an alleged member of this group, Defendant James Silas was charged alongside Marlon Eberhardt, Jovani Robinson, Heather Robinson, and others with conspiring to distribute heroin in the Eastern District of Tennessee and elsewhere. (Doc. 1.)

On June 14, 2016, Michael Thompson ("Detective Thompson"), a detective with the Hamilton County Sheriff's Office and a Task Force Officer with the DEA, prepared an application for an order authorizing the interception of wire and electronic communications (the "Application"). (Doc. 146-1.) Detective Thompson supplemented the Application with an eighty-seven page affidavit (the "Affidavit"). (Doc. 146-2.) The Application sought authorization to intercept wire and electronic communications to and from a cell phone belonging to Heather Robinson, a codefendant in the alleged conspiracy.

The content of the Application was derived from a number of sources. One such source was a group of individuals identified as Cooperating Sources 1, 2, and 3 ("CS-1, CS-2, and CS-3", respectively). CS-1 informed law enforcement that Eberhardt was a large-scale heroin distributor in east Tennessee with suppliers in Chicago, Nashville, and Atlanta. (Doc. 146-2.) CS-1 noted that Heather and Jovani Robinson worked as distributors for Eberhardt and that CS-1 had accompanied them on multiple heroin purchases. CS-2 informed law enforcement that he or she had rented roughly fifteen vehicles for members of the Eberhardt Organization that were used as part of the drug trafficking operation. (*Id*.) CS-2 also engaged in at least three controlled purchases of heroin from Heather Robinson. (*Id*.) CS-3 self-identified as a regular customer of

both Eberhardt and the Robinsons and twice completed controlled heroin purchases from Eberhardt in April 2016. (*Id.*)

Details of physical surveillance, interviews with Eberhardt Organization customers, vehicle tracking devices, and pen registers further supplemented the Application. In December 2015 and January 2016, Hamilton County detectives reviewed phone calls between Hamilton County Jail inmates and Heather Robinson in which coded references were made to stash houses and drug transactions. (*Id.*) Law enforcement gathered information from interviews with Heather Robinson's known heroin customers, controlled phone calls, and vehicle tracking devices. (*Id.*) In addition, pen registers were activated on two cell phones owned by Heather Robinson ("Target Telephone 1" and "Target Telephone 2"). The pen registers identified twenty-one different telephone numbers regularly contacted by both Target Telephone 1 and Target Telephone 2.

In addition, the Affidavit included a lengthy section labeled "Need for Interception" (Doc. 146-2). In it, Detective Thompson listed the six "goals and objectives" of the investigation: (1) discover the full scope and identification of key personnel in the Eberhardt Organization; (2) discover the identities and roles of all drug suppliers to the identified conspirators; (3) discover the identities of the main customers; (4) discover the stash locations for the drugs; (5) discover the management and disposition of the proceeds generated by the drug trafficking; and (6) obtain admissible evidence that demonstrates beyond a reasonable doubt that Eberhardt, Heather Robinson, and the other targeted interceptees committed the alleged violations of law. (*Id.*)

Detective Thompson then discussed the investigative techniques that had been employed to date and why those techniques had been unsuccessful in meeting the above objectives. Among those discussed were: (1) physical surveillance; (2) confidential sources and cooperating sources; (3) interviews; (4) search warrants; (5) controlled purchases; (6) pen registers; (7) trash searches; (8) pole cameras; and (9) tracking devices. Detective Thompson explained the shortcomings of each[2]:

- Physical surveillance was conducted but was of limited use because suspects used counter-surveillance measures requiring law enforcement to discontinue the surveillance for fear of alerting the suspects to the fact that they were being investigated. It also did not provide conclusive evidence of the specific roles of the co-conspirators. (*Id.* ¶¶ 119-21.)

- Three cooperating and confidential sources were developed but were only customers of the Eberhardt Organization and could not provide information about the internal structure and activities of the organization. (*Id.* ¶ 132.)

- Undercover agents were not used because the Eberhardt Organization was a closed, tight knit community. Attempting to bring in an undercover agent would have aroused suspicion and been very dangerous. While law enforcement was able to recruit confidential sources through interviews, the confidential sources took the investigation as far they could. (*Id.* ¶¶ 138-40.)

- Search warrants were executed in the investigation, which revealed drugs, drug paraphernalia, and a firearm, but they did not reveal information about the scope, structure, and overall operations of the Eberhardt Organization. One subject of a search (Quintus Broadnax) refused to speak with law enforcement at all, while another (Kadie England) refused to provide any information about Eberhardt's drug activities.

- Five controlled purchases were made from Heather Robinson and Eberhardt, but these purchases did not and could not reveal the full scope and structure of the Eberhardt Organization, including its out-of-state suppliers.

- Pen register and trap and trace information was used and helped verify frequent telephone communication between numbers, but they did not and could not identify who was making the calls or reveal the substance of the conversations.

---

[2] The following summation is taken from R&R 1.

- Trash pulls were utilized and did lead to the discovery of a piece of mail addressed to Eberhardt at a certain address, but trash pulls produced little evidence of value and were difficult to conduct without being discovered. (*Id.* ¶ 153).

- Law enforcement also used pole cameras to observe traffic to and from Heather and Jovani Robinson's house. The cameras were useful in identifying some of the target interceptees and appeared to record some hand-to-hand drug transactions, but the footage had no sound, thereby limiting its usefulness. Pole cameras also could not capture activity inside cars or the residence.

- Three tracking devices were placed on vehicles rented by CS-2 for Heather Robinson. The devices were useful in locating Heather Robinson and in assisting with surveillance, but they could not identify persons being met or the activity taking place. Further, the batteries in the devices had to be changed frequently, members of the Eberhardt Organization frequently changed vehicles, and the vehicles could not be monitored on private property.

- Mail covers were not used because there was no indication the Eberhardt Organization was using the mail to conduct its drug trafficking business.

- A previous wiretap was issued by a United States District Judge in Maine in June 2010 and used to intercept the wire and electronic communications of Veronica Grady. Heather Robinson was intercepted pursuant to this wiretap; however, the interception was not narcotics-related nor criminal in nature.

- While a financial investigation was initiated, no significant assets of the target interceptees—who dealt primarily in cash and hid their assets under different names—were located.

- Based on advice from the Assistant United States Attorney assigned to the case and his own experience, Detective Thompson opined that grand jury subpoenas—with or without offers of immunity—had not been used because the principals of this conspiracy would likely lie or invoke their Fifth Amendment privileges, and, if they were given immunity to testify, then the most culpable members of the conspiracy could not be prosecuted. (*Id.* ¶ 130.) Additionally, the service of grand jury subpoenas on the conspirators would alert them to this investigation which could cause them to become more cautious, flee, or threaten the informants and cooperating witnesses. (*Id.*)

- Based on his experience, Detective Thompson believed interviews with the subjects and known associates would derive insufficient information as to the identities of those involved in the conspiracy, the source of the drugs, the location of records and drugs, and other pertinent information. Detective Thompson believed that responses in such interviews would have been riddled with untruths, frustrating the investigation, and that such interviews would alert the other members of the conspiracy, which could result in the destruction or concealment of important evidence.

Detective Thompson therefore concluded interception of wire and electronic communications was "the only available technique [with] a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt that the target interceptees [were] engaged in the target offenses . . . [and would] enable the government to further the goals and objectives of the investigation." (*Id.*)

District Judge Travis McDonough authorized the wiretap on June 14, 2016, which DEA agents monitored from June 14, 2016 to July 14, 2016. During this time, agents intercepted at least six phone conversations between Heather or Jovani Robinson and an individual identified as "the P" or "The Prince," using a specified telephone number. Additionally, several text messages were exchanged between Heather Robinson and the same phone number. The phone number was subscribed to Jacqueline Riley, who was later identified as the spouse of Defendant.

B.     **Search of Defendant's Cell Phone**

Relying heavily on the above intercepted communications, agents prepared an application and accompanying affidavit for a search warrant to search Defendant's residence in Illinois.[3] A district judge in the Northern District of Illinois issued the warrant on October 4, 2016. (Doc. 146-4.) DEA Agent Michael McClarence, Officer Christopher Oslanzi, Officer Pat Curran, and Agent Bill Wise testified at the suppression hearing as to the execution of the search warrant.

Agent McClarence intended to execute the search warrant on October 12, 2016. He drove by Defendant's residence the day before to conduct a "spot check." He observed a white Cadillac Escalade in the driveway with a mattress tied to its top and furniture and luggage inside.

---

[3] The Affidavit for the search warrant also relies heavily upon the interviews of Heather and Jovani Robinson that took place on August 24, 2016, after a search warrant was executed at their residence in north Georgia. During those interviews, both Jovani and Heather Robinson identified Defendant as a source of supply and described trips taken to the Chicago area to retrieve heroin for distribution in Chattanooga, Tennessee.

It sat nose-to-nose with another vehicle, the hoods of both vehicles raised. Agent McClarence concluded Defendant was preparing to jumpstart the Escalade and vacate the premises. As a result, Agent McClarence summoned other officers to Defendant's residence to conduct the search immediately.

Officer Curran and Officer Tom McDonald approached Defendant in the driveway. Officer Curran stated, in a calm voice, "James Silas. Police. We have a search warrant for your residence." No guns were drawn, and no voices were raised. Officer Curran conducted a pat-down search of Defendant, finding only a cell phone.[4] Defendant was not handcuffed.

Agent McClarence, Defendant, and another officer entered Defendant's residence and sat at the kitchen table while other officers conducted a protective sweep and a search of the home. Defendant asked if he was under arrest, and Agent McClarance informed him he was not. Defendant was not handcuffed and no weapons were drawn. The conversation was calm and polite. Agent McClarence informed Defendant of his *Miranda* rights orally and in writing, and Defendant signed a *Miranda* rights waiver form.

About fifteen minutes after police entered the residence, officers found cell phones in a bedroom. Agent McClarence asked Defendant if there were any other phones. Defendant answered, "Yes, in the Escalade." Agent McClarence asked if he could retrieve the cellphone, and Defendant replied that he could. Officer Oslanski then retrieved a black Samsung Galaxy Note cell phone from the Escalade. At the request of Agent McClarence, Defendant gave agents the passcode to open the phone. After about thirty or forty minutes, Tennessee DEA agents arrived and assumed control of the interview. Chattanooga DEA agent Bill Wise questioned Defendant for about an hour, asking additional questions about the alleged heroin conspiracy.

---

[4] This cell phone is not the subject of the motion to suppress.

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R or the specified proposed findings or recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court to rehear witnesses whose testimony has been evaluated by the magistrate judge. *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980). The magistrate judge, as the factfinder, has the opportunity to observe and hear the witnesses and assess their demeanor, putting him or her in the best position to determine credibility. *See Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999). The magistrate judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

In resolving objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## III. DISCUSSION

### A. Wire Communications

In seeking suppression of evidence, the defendant must demonstrate a "violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003); *see also United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014). A defendant who seeks suppression of evidence obtained through a wiretap bears the burden of production and persuasion. *Patel*, 579 F. App'x at 453 (citing *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998)). The court considers the evidence in the light most favorable to the government. *Patel*, 579 F. App'x at 453 (citing *United States v. Rodriguez*-Suazo, 346 F.3d 673, 643 (6th Cir. 2003)).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522, governs the legal requirements for wiretaps. The statute requires that each application for a wiretap justify the necessity of the intrusion. 18 U.S.C. § 2518(1)(c). This "necessity requirement" was designed to "ensure that a wiretap is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007). To satisfy this requirement, the government must provide a "full and complete" statement that traditional investigative procedures: (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. *Id*.

The government is not, however, "required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *United States v. Alfano*, 838 F.2d 158, 163-64 (6th Cir. 1988). "[T]he mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *United States v. Stewart*, 306 F.3d 295, 305-06 (6th Cir. 2002). Rather, "[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163–64 (internal quotation marks omitted).

At the same time, the investigators' belief must be properly rooted in fact. "A purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand" falls short of the statute's demands. *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977). Even still, generic explanations are not automatically fatal. "The prior experience of investigative officers is relevant in determining whether other investigative procedures are unlikely to succeed if tried." *Id*. And "the mere fact that [an] affidavit . . . rest[s]

in part on statements that would be equally applicable to almost any [similar case] does not render the affidavit insufficient." *Id*. What must supplement these more generic explanations is simply "information about particular facts of the case at hand which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation." *Id*.

The crux of Defendant's argument is that the Affidavit is factually insufficient. Specifically, Defendant attacks particular portions of the Affidavit as using nothing more than boilerplate language in explaining the necessity of the wiretap. Defendant identifies, in particular, three investigative techniques discussed in the Affidavit that were not used before resort to the wiretap: (1) grand jury subpoenas, (2) subject interviews, and (3) additional search warrants. Defendant argues the Affidavit's explanations as to why the Government forewent these techniques relied on generalizations, devoid of fact-specific details, that could have applied to any run-of-the-mill drug conspiracy. Defendant buttresses this point with a discussion of *Rice*, arguing that the generalizations fatal to the affidavit there are likewise fatal here.

Defendant's characterizations of the Affidavit, however, are not borne out by review. First, in addressing the use of grand jury subpoenas, Detective Thompson noted the subjects targeted were likely the most culpable members of the conspiracy, and shielding them with immunity would thwart their prosecution. The Affidavit further provided most of the individuals of interest participated in a variety of illegal activity. Detective Thompson thus anticipated those individuals invoking Fifth Amendment protection or lying under oath unless confronted with facts that would force them to speak truthfully. Moreover, the Affidavit later noted both the familial and gang-related ties between many members of the conspiracy. Such ties, Detective Thompson surmised, made it all the more likely the co-conspirators would alert, or lie on behalf

of, one another. Text messages between conspirators complaining about "snitching" and "getting people indicted" reinforced this belief.

The Court fails to see how these are "purely conclusory" generalizations lacking "any factual relations to the circumstances at hand." While Defendant is correct in recognizing the above circumstances are familiar hallmarks of the average drug conspiracy, this in no way detracts from their factual basis in the instant case. The Affidavit demonstrates that the service of grand jury subpoenas was given "serious consideration" as an investigatory technique and that the decision to forego it was based specifically on the conspirators' degree of culpability, the relationships between them, their involvement in various forms of illegal activity, and specific electronic communications between members.

Similarly, the Affidavit's discussion of subject interviews is supported with ample factual detail. Detective Thompson first relayed how interviews with non-subjects had been effective in gathering information about membership of the Eberhardt Organization and in cultivating confidential sources. Where this tactic failed, however, was in gleaning the identities of other conspirators or the location of drugs and records. The Affidavit then described three instances in which non-subject interviewees had either refused to speak with law enforcement or could not be found upon attempts to contact them. Detective Thompson ultimately concluded interviews with the subjects themselves would likewise prove ineffective. He again noted the familial and gang-related ties among the conspirators would likely dissuade them from incriminating their own. Such ties also gave rise to the worry that the subjects would alert other members as to the investigation, lie on behalf of other members, or destroy evidence.

Defendant claims this portion of the Affidavit fails to discuss why the Government believed the actual subjects—namely, Heather and Jovani Robinson—would be uncooperative if

12

confronted in interviews with overwhelming evidence against them. To the contrary, the Affidavit repeatedly cites the familial and gang-related connections between the conspirators—a reasonable basis to assume these subjects might be slow to incriminate one another. More significantly, though, the Affidavit details two instances in which interviews failed, even where the subjects of those interviews were confronted with "overwhelming evidence." Law enforcement arrested and interviewed on separate occasions both Quintus Broadnax and Kadie England after seizing from these suspects drug paraphernalia, narcotics, and incriminating text messages. Despite these seizures, Broadnax declined to speak at all with law enforcement, and England refused to provide any details about Eberhardt's drug activities. The Court is not prepared to conclude interviews with the Robinsons—when confronted with similar evidence—would have unfolded differently.[5] Despite Defendant's contentions, this portion of the Affidavit, again, shows additional interviews were expressly contemplated and that the decision to forgo them was factually and reasonably rooted.

So too, was the decision to forgo additional search warrants. The Affidavit describes the execution of search warrants at two separate, non-subject residences—those of Broadnax and CS-3. Narcotics and drug paraphernalia were found during the searches, but these discoveries were of little use in identifying the Eberhardt Organization's sources of supply or other conspirators. Based on these results, Detective Thompson concluded the use of additional search

---

[5] Defendant appears to address this question by pointing to Heather Robinson's post-wiretap August 2016 interview. In this interview, Ms. Robinson identified Defendant and another person as her out-of-state suppliers and implicated approximately twenty others as being involved in the conspiracy. This cooperation, Defendant argues, proves subject interviews were underutilized and ill-considered. The Court notes, however, that Ms. Robinson was forthcoming only *after* law enforcement was able to confront her with information gathered through the wiretap. That Ms. Robinson cooperated post-wiretap does not support the proposition that she would have likewise cooperated without the additional intelligence gathered through the use of this technique.

warrants would, at best, uncover nominal narcotics stashes that would likely implicate only the subject of the search, rather than reveal the broader scope of the conspiracy—a counterproductive step if taken at the cost of alerting the conspiracy's most culpable members.

Defendant seeks to discredit this conclusion. To do so, he draws attention to the apparent contradiction between Detective Thompson's conclusion that searches of the subjects' residences would be minimally revealing and his belief elsewhere expressed that Heather Robinson was storing drugs in her home on Marlon Eberhardt's behalf. These positions, though, do not conflict. Even assuming Heather Robinson was storing heroin in her home, this assumption remains consistent with the belief that a search of the home would likely implicate only the homeowner, absent a confession from Heather Robinson as to whom the heroin actually belonged. And in light of the dead ends hit in the searches and subsequent interviews of Broadnax and CS-3, Detective Thompson predicted that more search warrants would do little to uncover the broader edges of the conspiracy. Again, the Court fails to see how this portion of the Affidavit is factually lacking.

Finally, Defendant's reliance on *Rice* is misplaced. The deficient affidavit used there to obtain a wiretap averred law enforcement had conducted extensive physical surveillance of the suspect in question and set forth reasons as to why other tactics would be dangerous or ineffective. *Rice*, 478 F.3d at 706-08. The district court, however, found these averments misleading. In fact, according to the court, "there was no evidence that any other investigative technique was ever used or even seriously considered." *Id*. at 709. The court also found the wiretap had been used in a forbidden manner—as the first step in the investigation. *Id*. After excising the untrue portions of the affidavit, the district court was left with "generalized and uncorroborated information about why [other investigative tactics] would not be useful." *Id*. at

14

711. Accordingly, the district court suppressed the wiretap evidence, and the Sixth Circuit affirmed.

In contrast, the Affidavit here shows a host of alternative techniques were employed before resort to the wiretap. As Magistrate Judge Steger noted, law enforcement conducted extensive physical surveillance; interviewed and cultivated three confidential sources; interviewed three other persons believed to have knowledge of the Eberhardt Organization; executed two search warrants at the residences of persons involved in the Eberhardt Organization; conducted five controlled drug buys from members of the Eberhardt Organization; gathered intelligence from several pen registers and trap and trace warrants; conducted trash pulls; used video recordings from pole cameras; placed tracking devices on vehicles; and initiated a financial investigation. Only after these tactics failed to further the objectives of the investigation did law enforcement seek a wiretap. Moreover, the reasons provided for bypassing other techniques were rooted specifically in the family and gang connections between the conspirators; the warnings against "snitching" unearthed in text message exchanges between conspiracy members; the prior failures of the contemplated investigative techniques when applied to non-subjects; and the professional experience of law enforcement officers. This is a far cry from the "misleading," "generalized," and "uncorroborated" affidavit invalidated in *Rice*. What *Rice* demands is not that every possible investigatory option be exhausted. What is required, rather, is an explanation as to why alternative investigatory tactics would be inadequate and additional facts that show wiretaps are not being used as the first tactic in an investigation. *Rice*, 478 F.3d at 710. Detective Thompson's eighty-seven-page Affidavit does just that.

**B.     Search of the Cell Phone**

Law enforcement searched Defendant's Samsung Galaxy cell phone without a warrant. In support of the legality of this search, the Government relies on two exceptions to the warrant requirement: (1) consent and (2) the automobile exception. Because the Court finds Defendant consented to the search, it does not address the applicability of the automobile exception.

A search conducted pursuant to valid consent is a well-recognized exception to the general warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). A warrantless search may be conducted where a person with a privacy interest in the place to be searched gives free and voluntary consent. *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002). Consent is voluntary when it is "unequivocal, specific, intelligently given, and free from duress or coercion." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011). "Whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth*, 412 U.S. at 227; *see also Beauchamp*, 659 F.3d at 571. The government must establish voluntariness by a preponderance of the evidence, with evidence that is clear and positive. *Beauchamp*, 659 F.3d at 571.

Though there are no bright line rules to follow when assessing the totality of the circumstances, several factors are to be considered. *Id*. at 572. "First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *Id*. Additionally, a court should consider "the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police; and indications of more subtle forms of coercion that might flaw [an individual's] judgment." *Id*. (internal citations omitted). Furthermore, a defendant

"must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police in order to invalidate consent." *Elkins*, 300 F.3d at 648.

Defendant points the Court to *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999). There, plain-clothes officers approached the defendant, Worley, in an airport as he was placing his bags in an airport locker. After inspecting Worley's identification, ticket, and boarding pass, the officers asked if they could look inside his bag. Worley responded, "You've got the badge, I guess you can." *Id*. at 383. The subsequent search revealed methamphetamine. In assessing whether Worley consented to the search, the Sixth Circuit acknowledged the absence of overt duress or coercion—there was no lengthy detention, no weapons were drawn, and the parties spoke in calm, conversational tones. *Id*. at 386. The court, nonetheless, invalidated the search. According to the court, Worley's statement to the officers, "you've got the badge, I guess you can" was not an "unequivocal statement of free and voluntary consent." It was merely "an expression of futility in resistance to authority or acquiescing in the officers' request." *Id*.

Defendant argues he—just like Worley—had no choice but to let law enforcement search his cell phone. He recounts how multiple DEA agents and task force officers arrived at his home out of the blue to execute a search warrant. He was separated from his family, taken inside his home while his wife and children were told to remain outside. Officers sat with Defendant at his kitchen table while others searched his home. Though he was not under arrest, Defendant was told he could not leave while the search warrant was executed. Two or more officers were with Defendant at all times, and none of the officers informed Defendant of his right to refuse the search of his cell phone. The product of this environment, Defendant argues, was not consent; it was coerced acquiescence to police authority.

The *Beauchamp* factors, however, suggest otherwise. First, there is nothing about Defendant's characteristics to suggest he was incapable of consent, or particularly susceptible to the officers' requests. Defendant is an adult. No evidence was presented that would suggest Defendant suffered from any mental disability or was otherwise intellectually impaired. Moreover, in light of his prior murder conviction, it is likely Defendant's experience with law enforcement is more extensive than that of someone without such a conviction.[6] Defendant was read his *Miranda* rights before being questioned. And although Defendant was not told he could refuse the search of the cell phone, this fact alone does not automatically render a consent-based search involuntary. *Schneckloth*, 412 U.S. at 227.

There is also nothing about the detention itself to suggest it was unduly coercive. Law enforcement approached Defendant in a calm manner. No guns were drawn. No threats were made. Two officers sat with Defendant at the kitchen table in his own home while other officers executed the search warrant. Conversation between Defendant and the officers was calm and polite. Agent McClarence, in fact, testified that Defendant was exceptionally cordial and cooperative. And though Defendant was not free to leave during the search, he was told he was not under arrest and was free to leave once the search concluded. Indeed, Defendant *did* leave once the search concluded.

*Worley*, moreover, is readily distinguishable. The encounter, there, occurred in an airport. The Sixth Circuit took special care to emphasize the natural stresses in such an environment that could pressure an unwilling suspect to acquiesce in an officer's request. It specifically noted the frequent rush to make flight connections, the surprise from being accosted

---

[6] Defendant takes issue with the Magistrate Judge's discussion of these personal characteristics. *Beauchamp*, however, directs the court to consider precisely such things—the suspect's age, intelligence, education, and whether he understands his rights in the interaction. The Magistrate Judge did not err by discussing these factors.

in a crowded concourse, and the desire to avoid an untoward scene in front of large crowds. *Worley*, 193 F.3d at 387. None of these pressures, though, inhered in the instant case. Defendant was questioned in his own home, away from the prying eyes of a crowded airport. More significantly, Defendant offered no statement resembling that in *Worley*. There, when asked if officers could search his bags, Worley responded with an express nod to police authority ("You've got the badge") and equivocal submission to it ("I guess you can"). No evidence was offered that Defendant responded in any such manner here. Agent McClarence testified that when he asked if agents could retrieve the cell phone from the Escalade, Defendant responded they could. Taken together, the above circumstances indicate Defendant voluntarily consented to the retrieval and search of the cell phone.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes the necessity of the wiretap was properly supported in the Affidavit, and Defendant voluntarily consented to the search of his cell phone. The Court will therefore **DENY** Defendant's motions to suppress the evidence derived from the wiretap (Doc. 145), the search of the cellphone (Doc. 147), and the photographic identification (Doc. 151).

**An appropriate order shall enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**